# COURT OF APPEALS
# DECISION
# DATED AND FILED

## March 19, 2024

**Samuel A. Christensen**
**Clerk of Court of Appeals**

## NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2023AP2404**
**2023AP2405**
**2023AP2406**

Cir. Ct. Nos. **2022TP57**
**2022TP58**
**2022TP59**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT I**

APPEAL NO. 2023AP2404

IN RE THE TERMINATION OF PARENTAL RIGHTS TO K.S., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

     PETITIONER-RESPONDENT,

  V.

K.P.,

     RESPONDENT-APPELLANT.

APPEAL NO. 2023AP2405

IN RE THE TERMINATION OF PARENTAL RIGHTS TO K.P., A PERSON UNDER
THE AGE OF 18:

STATE OF WISCONSIN,

       PETITIONER-RESPONDENT,

   V.

K.P.,

       RESPONDENT-APPELLANT.

APPEAL NO. 2023AP2406

IN RE THE TERMINATION OF PARENTAL RIGHTS TO K.P., A PERSON UNDER
THE AGE OF 18:

STATE OF WISCONSIN,

       PETITIONER-RESPONDENT,

   V.

K.P.,

       RESPONDENT-APPELLANT.

APPEALS from orders of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge. *Affirmed.*

¶1 GEENEN, J.[1] Kevin appeals from circuit court orders terminating his parental rights to his children, Keanu, Kyle, and Keith.[2] Kevin argues that the circuit court erroneously exercised its discretion when it determined that the termination of Kevin's parental rights was in the best interests of the children. Specifically, Kevin argues that termination was not in the children's best interests because he there was evidence—his own testimony—that there was a substantial relationship between himself and the children, and because there was a lack of evidence of the children's wishes. This court disagrees, and for the following reasons, affirms the circuit court's orders.

## BACKGROUND

¶2 On March 17, 2022, the State filed petitions to terminate Kevin's parental rights to Keanu, Kyle, and Keith.[3] Kevin was charged with child neglect related to Keanu in May 2020, prompting the Division of Milwaukee Child Protective Services to prohibit Kevin from spending time with the children unsupervised. The CHIPS[4] cases underlying the petitions were initiated and the children were removed from the family home in September 2020 after doctors discovered that Kyle and Keith each suffered from broken bones in their legs

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] For ease of reading, the family in this confidential matter is referred to using pseudonyms. *See* WIS. STAT. RULE 809.19(1)(g).

[3] The State also sought to terminate the parental rights of the children's mother; however, the mother's rights are not at issue on this appeal.

[4] CHIPS is an acronym used "to denote the phrase 'child in need of protection or services' as used in the Wisconsin Children's Code, chapter 48, Stats." *Marinette Cnty. v. Tammy C.*, 219 Wis. 2d 206, 208 n.1, 579 N.W.2d 635 (1998).

caused by their mother. At the time of removal, Keanu was twenty months old, and Kyle and Keith were five months old.

¶3 At the grounds hearing on February 27, 2023, Kevin entered a no-contest plea to the failure to assume parental responsibility ground. *See* WIS. STAT. § 48.415(6). The circuit court accepted Kevin's plea, and after hearing testimony to prove this ground on August 9, 2023, found Kevin unfit pursuant to WIS. STAT. § 48.424(4). The circuit court then moved to the dispositional phase of termination of parental rights (TPR) proceedings.

¶4 On June 30, 2023, a bonding assessment was conducted by a therapist to determine the type of relationship Keanu, Kyle, and Keith have with Kevin. In the bonding assessment report the therapist stated that the children all displayed insecure attachment styles with Kevin. As a result of her observations, she concluded that the children would likely be unable to "thrive emotionally or socially" under Kevin's care unless he makes specific changes such as taking accountability for his actions, acknowledging each child's emotions without displaying aggression, and forgoing physical discipline. The therapist noted that Kevin had failed to acknowledge that any violence occurred around the children, minimized his own actions, and failed to recognize how his actions impacted others. She explained that it takes time to make these changes and estimated that it would take approximately two years for Kevin to make and maintain her recommended changes.

¶5 The circuit court held two dispositional hearings on August 9 and 11, 2023. The circuit court heard testimony from the therapist who conducted the bonding assessment, the case supervisor, Keanu's foster mother, Kyle's and Keith's foster mother, the children's biological mother, and Kevin. After

reviewing the testimony and evidence, the circuit court concluded that it was in the best interests of Keanu, Kyle, and Keith to terminate Kevin's parental rights.

¶6      The circuit court noted that Kevin has struggled with trauma, alcohol, and drug issues that are "holding [him] down." It emphasized that Kevin is not a bad person; rather, he is someone who has not figured out how to unlearn some bad behaviors. The circuit court acknowledged that Kevin had "come up with a way to deal with his alcohol and drug issues." However, the circuit court also discussed how Kevin had not yet figured out how to resolve his behaviors related to domestic violence. The circuit court highlighted the therapist's conclusion from the bonding assessment that the children did not have a parental attachment to Kevin, and that they would not have a stronger attachment until Kevin is able to make some changes including taking accountability for his actions. The circuit court then explained its decision by going through each factor in WIS. STAT. § 48.426(3) for each child.

¶7      The circuit court considered that all three children have a strong likelihood of adoption, the ages and health of the children, that the children had been in out-of-home care for nearly three years and did not have a substantial relationship with any biological family members, that the potential harm from severing Kevin's legal relationship to the children is "minimal," and that terminating Kevin's parental rights would allow the children to enter a more stable and permanent family relationship. The circuit court also noted that Keanu wanted to be adopted and live with his foster parents because he said he feels safe there, and noted that Kyle and Keith were too young to express their wishes on the matter. Thus, the circuit court concluded that, in light of all of the facts, terminating Kevin's parental rights was in the children's best interests.

¶8      Kevin now appeals the circuit court's orders.

## DISCUSSION

¶9      Kevin takes issue with the second phase of TPR proceedings, the dispositional phase.[5]  At the dispositional phase, the circuit court must consider the evidence and make a record that "reflect[s] adequate consideration of and weight to each factor" in WIS. STAT. § 48.426(3).  *State v. Margaret H.*, 2000 WI 42, ¶35, 234 Wis. 2d 606, 610 N.W.2d 475; *Sheboygan Cnty. DHHS v. Julie A.B.*, 2002 WI 95, ¶29, 255 Wis. 2d 170, 648 N.W.2d 402.  These factors include the following:

> (a) The likelihood of the child's adoption after termination.
>
> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.
>
> (d) The wishes of the child.
>
> (e) The duration of the separation of the parent from the child.
>
> (f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

---

[5] "[A] contested termination proceeding involves a two-step procedure.  The first step is the fact-finding hearing to 'determine whether grounds exist for the termination of parental rights.'"  *Sheboygan Cnty. DHHS v. Julie A.B.*, 2002 WI 95, ¶24, 255 Wis. 2d 170, 648 N.W.2d 402 (citation omitted).  "When the fact-finding step has been completed and the court has made a finding of unfitness, the proceeding moves to the second step, the dispositional hearing."  *Id.*, ¶28.

6

Sec. 48.426(3). The primary focus in the dispositional phase is on the best interests of the child. *Julie A.B.*, 255 Wis. 2d 170, ¶28.

¶10    Kevin argues the circuit court erroneously exercised its discretion asserting that there was insufficient evidence to support the circuit court's findings on the third and fourth statutory factors enumerated in WIS. STAT. § 48.426(3). Though we only individually address the factors Kevin challenges, our independent review of the records confirms that the circuit court adequately considered all of the statutorily required factors. We conclude that the circuit court's findings concerning the children's wishes and the lack of a substantial relationship between Kevin and the children are sufficiently supported by the evidence.

¶11    The circuit court exercises its discretion by weighing factors at the dispositional hearing to make its ultimate determination of whether to terminate parental rights. *Gerald O. v. Cindy R.*, 203 Wis. 2d 148, 152, 551 N.W.2d 855 (Ct. App. 1996). Wisconsin law does not "mandate the relative weight" to be placed on any particular factor. *Margaret H.*, 234 Wis. 2d 606, ¶29. "An appellate court will sustain the circuit court's ultimate determination in a proceeding to terminate parental rights if there is a proper exercise of discretion." *Id.*, ¶32.

¶12    "A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach." *Dane Cnty. DHS v. Mable K.*, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198. "We will search the record for reasons to sustain the [circuit] court's exercise of

discretion." *Lofthus v. Lofthus*, 2004 WI App 65, ¶21, 270 Wis. 2d 515, 678 N.W.2d 393.

¶13    Kevin argues that the evidence supports the existence of a substantial relationship between himself and his children. *See* WIS. STAT. § 48.426(3)(c).  In support of his argument, Kevin points to his testimony during the dispositional hearing where he discussed the steps he took and his great progress toward reunification, his visitation with the children, his experiences with the children during visitation, and his belief that he plays a significant part in the children's lives.  Kevin concludes that in light of his testimony, the third factor, § 48.426(3)(c), should not weigh in favor of the termination of his parental rights.

¶14    After considering all of the testimony given during the dispositional hearing, the circuit court concluded that none of the children had a substantial relationship with Kevin.  In particular, the circuit court relied on the expert testimony of the therapist who conducted the bonding assessment between Kevin and the children.  The therapist testified that the children "don't present as having a substantial attachment or substantial relationship with either of their two biological parents."  The therapist explained that Kyle and Keith view Kevin more like an extended family member than a parent.  Regarding Keanu, the therapist testified about how acts of violence, such as "[Kevin] whooping [Keanu] [and] locking him in a closet," negatively impacted their relationship.

¶15    Testimony from the other witnesses also supports the circuit court's finding.  The case supervisor characterized Kevin's relationship with the children as "inconsistent and distant."  Both Keanu's foster mother and Kyle's and Keith's foster mother testified that the children do not talk about Kevin outside of visits with him.  The court also considered other evidence and indicia of the relationship.

For example, it noted that the children had been in out-of-home care for about three years, which is the majority of the children's lives. Kevin's visits with Keanu had progressed to partially unsupervised; however, visits were suspended and converted to therapeutic visitations after Kevin used excessive physical discipline during visits. In the eight months between the time Kevin's visits resumed and the start of the dispositional hearings, Kevin visited Keanu twice.

¶16 Regarding Kyle and Keith, Kevin had supervised visits scheduled for twice a week but did not always participate. Kevin failed to show improvement with controlling his aggression during these visits. Relatedly, the bonding assessment discussed how this aggression impairs the children's ability to form a secure relationship with Kevin. Thus, the circuit court's finding that Kevin did not have a substantial relationship with the children is well supported by the evidence.

¶17 To the extent that Kevin is arguing that the circuit court should have given his testimony more weight than the testimony of the other witnesses when it considered WIS. STAT. § 48.426(3)(c), we note that "[a] determination of the best interests of the child in a termination proceeding depends on first-hand observation and experience with the persons involved[.]" *David S. v. Laura S.*, 179 Wis. 2d 114, 150, 507 N.W.2d 94 (1993). We give due regard "to the opportunity of the [circuit] court to judge the credibility of the witnesses." WIS. STAT. § 805.17(2). The records reflect that the circuit court appropriately considered Kevin's testimony in the context of the other testimony given and as relevant to § 48.426(3)(c). The circuit court did not erroneously exercise its discretion with the weight it gave Kevin's testimony when it evaluated whether the children had a substantial relationship with Kevin.

9

¶18    Kevin also stresses that "there was no evidence of the wishes of the children." *See* WIS. STAT. § 48.426(3)(d).  However, there was evidence of the children's wishes presented to the circuit court.  While Kyle and Keith were both only three years old at the time of the hearings, and thus too young to express their wishes, there was evidence presented regarding Keanu's wishes.

¶19    In the bonding assessment, the therapist described a conversation with Keanu where she asked him "if he was allowed to choose where he would choose to live and [she] gave the options of [his mother], [Kevin], and his foster parents.  [Keanu] stated he wanted to live with his foster parents as he feels it is safe with them."  The therapist also addressed this conversation in her testimony.  Additionally, Keanu's foster mother testified that Keanu told her that he wanted to stay with her.  This evidence is sufficient to support the circuit court's consideration of the children's wishes.  *See* WIS. STAT. § 48.299(4)(b) ("[N]either common law nor statutory rules of evidence are binding at a … dispositional hearing ….  Hearsay evidence may be admitted[.]").

## CONCLUSION

¶20    After reviewing the records, it is clear that the circuit court did not erroneously exercise its discretion when it determined that terminating Kevin's parental rights was in each child's best interests.  Ultimately, the circuit court examined the relevant facts, applied the proper standard of law and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.  *See **Mable K.***, 346 Wis. 2d 396, ¶39.  Accordingly, we affirm.

*By the Court.*—Orders affirmed.

10

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.